I assume, the Court, please, that there is a motion by the appellee, but do I argue that point now, even though it's their motion? You're referring to the motion to dismiss? Yes. Yes, why don't you just go ahead and do that, if you wish. All right, thank you. There isn't much I can say about that. I simply haven't been able to find any authority when you get to the point of Circuit Court of Appeal having received the appeal, all the briefings done, and all that remains is oral argument. But more importantly, I haven't been able to find any cases that indicate a bankruptcy court can dictate the progress of a court of appeal. And to that extent, that's all I can say about this. Okay, well, if counsel says anything that you wish to respond to, then, of course, you'll have that opportunity. May I argue now the substance? Oh, that's fine. If the Court, please. There were triable issues of fact. I do understand that district courts, they certainly are overworked, to say the least. However, I could not ignore the fact that what we heard, especially in oral argument at the district court, was the court's reference to discrimination, gender discrimination. That wasn't this case. This case was retaliation. We did not have evidence of discrimination, gender discrimination. We only had evidence of retaliation. Ms. Clark had specific training on zero tolerance. She was an executive. She also had an obligation to follow that. And when the people under her were being harassed, insulted, I think the record is clear on that, she did what she had an obligation to do. She did it. Unfortunately, as the record shows, this upper supervisor only got a day off work. He was fired, wasn't he? No. No, let me explain. There is in the appellees a brief, an argument or a point that is made that MCI, I'll refer to it only as MCI now, MCI took over in the spring of 98. But prior to that, the acquisition actually occurred in the fall of 97. So you had an overlapping. You don't simply, one big corporation takes over another on one day and that's it. It was a gradual acquisition for all the legal papers that are done to acquire one company by another. MCI's people came in apparently in the spring of 98. But they were not, MCI had actually started the acquisition in the fall of 97. And I don't think that we've got anything contrary to that. So what we had was an overlap. This individual, who was, call him the bad guy, he was let go at least six months after MCI had taken over. And during this overlap period, if you want to call it that, he continued what he was doing. What did Clark do? Clark did the same thing. She was observing zero tolerance. There is no evidence, and I think counsel will agree, that MCI revoked its zero tolerance position. It was the same zero tolerance. Zero is zero. There's a few points I'd like to make, and I am watching the clock. There are triable issues of fact, not the least of which is the zero tolerance that was honored more in the breach than in its application. Clark? Excuse me, counsel. What proof would you point to in the record that would either establish or raise a triable issue of fact as to the nexus, the connection between your client's reporting of Mr. Roth's actions and words and the adverse employment action taken against her? I may save that for the last two minutes because I'd have to refer to the brief. But let me point out that our brief attempts to show the connection one after another. There wasn't just this Mr. Roth, but a Mr. Stables. Even Mr. Stables testified, and that's in the record, that her problem was only with Roth and Stables. Stables continued on even after, I guess, Roth was finally terminated after, quite a few months after MCI took over. There's another thing that I wanted to point out that can get lost is the argument that Apley makes that there was a transfer request by Clark. Logically, and of course we don't agree with that, and the reason why is if she requests and is transferred in June of 98, then why on July 2nd of 98, within days, is she filing DFVH? She'd have no reason to. There's another thing, too. She's given three months to ramp up because now she's been transferred, demoted, whatever you want to call it. Three months to learn this new thing. Now she's transferred in June. By the end of July, now they're saying, oh, you haven't met your quotas. This is a matter of record. She was given three months to ramp up. Within one month, she's told that she can't meet her quotas. It's a brand new job. The so-called investigation came inconclusive, like money was somehow acquired that shouldn't have been by one or more of her subordinates. They had an investigation. It's inconclusive. But what do we have three years later? Her upper supervisor testifies at a deposition that they had no evidence. There is a difference between inconclusive and innocent. Ms. Dobrisch, you want to save the rest of your time? I'm going to save it. Okay. Ms. Lopez? Good morning. You may please the Court. I will first talk about the motion to dismiss that is pending before the Court at this time in light of the emergence from bankruptcy of WorldCom or MCI. We'll use that interchangeably. I think, you know, counsel says there's no authority, and that appears to me to be the case. But sort of beyond the fact that there's no authority for it, as a matter of sort of logic, I'm having a good deal of trouble with the concept that this Court is somehow divested of jurisdiction or the district court was somehow divested of jurisdiction simply because the stay was lifted. It is not simply because the stay is lifted. It's because the reason that this Court no longer has jurisdiction and plaintiff and appellant is enjoined from going forward on this claim is pursuant to the reorganization plan that is in order of the bankruptcy court effective April 20th. And pursuant to that reorganization plan, all claims arising before the effective date, and indeed this claim arised before even the petition was filed. Conceptually, they no longer exist in the form of a claim. They are now part of this reorganization plan. That's right. I just don't kind of understand it because this claim existed before, and it was tried as an adversary proceeding, and whatever happens as a result of the adversary proceeding will come out in the wash, as it were. And if Clark were to prevail, she would get whatever she would get as a result of the reorganization. Isn't that the way it comes down? Essentially, through the bankruptcy code, 11 U.S.C. section 1141 D1A and 11 U.S.C. 524 A2, it specifically provides that when there is a reorganization plan ordered by the court, then any pending claim pre the effective date of that order is now discharged through the plan. So it has now converted from a claim, I'm sorry, a lawsuit in front of this court, to a claim that shall be discharged through the plan. It's not to say that nothing happens to it at all. It now goes through the bankruptcy proceedings because that is how the plan chose to deal with that. And if plaintiff or what do I look at to find that because it just doesn't compute to me. I agree that it is sort of an anomaly from the perspective. Well, I've never heard of it. I mean, that doesn't mean a thing because I don't know anything about bankruptcy and I freely admit that. But it just doesn't make any sense that a lawsuit, an adversary proceeding to decide whether there is in fact any money owing to this claimant is somehow discharged because there's a plan. Well, it would go through the bankruptcy court. I understand if there's any value to it. That value will go through and then she'll get X cents on the dollar if she were to prevail. Isn't that the way it works? Right. And the bankruptcy court will now adjudicate whether or not there's any value to her. I understand that. But that's different from adjudicating whether she actually has anything that's worth anything. The bankruptcy court will do that as well. Boy. I know it's hard to believe. I mean, the district court's already made a ruling on it. Now it's before us. What is it? I don't see anything from the bankruptcy court saying that we don't have jurisdiction over this case. That is the plan and the bankruptcy code sections that I've cited that suggest that this court no longer has jurisdiction. That plan may well work on the parties, but I don't think it works on us. Well, I will add that other districts, including the 10th District, under the same argument in a matter in appeal, dismissed it pursuant to the same argument. I don't have the case number for that particular case. But if plaintiff had relief to have this claim continue in this court, when we notified the court of the bankruptcy and the stay and the court instituted the stay, plaintiff then had a mechanism to go to the bankruptcy court and seek a motion for relief from stay and actually present a claim to the bankruptcy court and say, hey, I have a claim that is now pending before the Ninth Circuit. It's been fully briefed in front of the Ninth Circuit. I think it should still be heard in the Ninth Circuit. She had that opportunity. There is such a mechanism under section, I believe it's 324 of the bankruptcy code. Plaintiff did not do that. So it's not to say that there would be no way this court would have jurisdiction over the claim, but plaintiff had to take steps to go through the bankruptcy court so that they could get relief from the stay and or plaintiff, after the issuance of the order could have gone to the bankruptcy court and asked for some sort of relief. Plaintiff has not done any of that. So therefore, there is – there should be nothing pending in front of this court on that ground. Plaintiff could have taken action to have this continue in this court, and she never did. I'm saying plaintiff, and, of course, I also mean appellant. Okay. You're saying this – that Clark has never made any kind of claim of any sort in the bankruptcy proceeding? Well, no. She filed a proof of claim, which is something different. That's what you do if you have – if you want to notify the bankruptcy court that you have – you're an unsecured creditor and you have a claim. She did do that, but she never went to the bankruptcy court and sought relief from the stay, which is specifically provided by the code, and she never sought relief to have this case heard. She could have done that. That happens many times. In fact, the bankruptcy court might well have said, yes, it's fully briefed in front of the Ninth Circuit, silly for us to argue it and hear it now. Go forward. And she never did that. Unless the court has any other questions on that issue, that is WorldCom's primary argument, that this should no longer be pending before this court based on the authority cited in my papers and that I have cited so far. If you have any other questions, I could address those. Otherwise, I'd like to go to the merits. Okay. On the merits, the fact is there's absolutely no evidence of any retaliatory motive, and there's no evidence of any causal connection between any adverse employment action and Ms. Clark's complaints about harassment or improper comments by Mr. Roth or her filing of her DFVH charge. She files her, she makes a complaint about Roth, one in early summer and one in mid-summer of 1997. The company does investigate. He's suspended. He is sent to sensitivity or respectful workplace training. He is also instructed that he must apologize to all those individuals whom he's offended. Counsel indicated something about the effective merger happening before the spring of 1998. I'm not exactly sure what he's referring to. Merger discussions had started in the fall of 1997, and the merger was effective in the spring of 1998. Upon the merger, Mr. Roth is terminated. Through the merger, there's no longer a place for him. I won't say that it is disciplinary for the conduct. Previously, that was the suspension and the training and the requirement to apologize. In any event, after she complains, she's given commendations for having good sales in that particular commercial sales arena. She's commended for doing a good job. And then, and that's about November 1997, an appellant admits that. And then after that is this report of the investigation of overpayment into commissions. The company, of course, has to investigate the overpayment of commissions. It's inconclusive as to whether or not Ms. Clark had knowledge. She's not disciplined for any overpayment of communications, of commissions, because there's no evidence to support that. She is disciplined, however, because she's confrontational and difficult through the investigation process. She does not cooperate with the investigators, and she, in fact, demonstrates that she's angry at them for the investigation and any accusations resulting, and she admits that in her deposition. So she's issued the February performance improvement plan for that conduct. And three months later, that performance improvement plan is lifted. And then in the meantime, now is the reorganization with WorldCom. They're reorganizing her department. Her department ultimately gets, her office gets scooped into under the Fresno's territory. She had previously worked in commercial sales. There's no longer going to be a manager of commercial sales in that area. She talks to the new person who's in charge of telecom. She expresses an interest in telecom, and he relies on that. Whether she wanted the demotion or didn't want it, that's what she expressed to him, and that's what he relies on when making the transfer decision. He had no knowledge of any prior complaints. He had no knowledge of the performance improvement plan, and neither did his co- his additional people who coordinated the transfer, Mr. Prinze, Mr. Levy, and Mr. Hiles, who then becomes his supervisor. She then goes into the position, and she fails to perform. Yes, she's given three months to ramp up. She does nothing in terms of making her quota ever, even after the three months. She's initially given some sort of performance outline about a month and a half after she starts because she's not submitting forecasting reports, even to get herself to the point of making quotas. It's not because she's not making quotas. Was there anything in the record indicating what quotas were generally given in that department? Was her quota any different from anybody else's? Everybody else in the department, there's no evidence in the record on that issue. Okay. She wasn't making her quotas. And so then after about eight months of trying to help her improve, trying to give her suggestions, telling her where she can go, she absolutely fails to meet her quotas, and ultimately she's terminated for failure to meet her quotas, and there's absolutely no evidence in the record. Indeed, counsel pointed to none of any retaliatory motive for any of these actions. Thank you. Thank you, counsel. Mr. Dogwood. At minute 43. The connection I think that Your Honor asked for was to be found in our bait stamp documents obtained from MCI, and they cover the period all the way through. Most significantly is the last statement attributed to Mr. Roth. Mr. Roth's comments obviously don't need to be repeated. However, the last thing he did say was, and this was in December of 97, after MCI had already acquired the company, he says to Stables, who was on upper management, that Clark needs to have her feet held to the fire. Now that tells us a connection, a connection in time that connects MCI directly and that both Roth and Stables were part of MCI. It ends with, actually it's sort of the banner of our appeal, is finally in December of 98 is this email, MCI email, which says, quote, on the training, this is referring to Clark, I would continue with it as if you are supporting her in wanting her to succeed. Now this is in December of 98. Why is she still on training? Well, one of the reasons is she didn't have any production in December of 98, and the reason why, she was on disability. She wasn't working. All I can do ‑‑ You might want to wind up because your time is expiring. I know. We have read the full record. I'm really down, and that's about all I'll offer. All right. Thank you for listening. We understand the argument, and the matter just argued will be submitted. We'll next to your argument in El Campo versus Ashcroft.
judges: Canby, Rymer, Hawkins